Good morning. I'm John Wu, attorney for Petitioner Mr. An Hong Ling. Mr. Ling and I are, of course, very grateful for this opportunity to address the Court of Arbitration. If you could speak up, please. The immigration judge denied Mr. Ling's application for political asylum, and he timely appealed to the Board of Immigration Appeals. The BIA's order was entered without opinion, so we asked this Court to review the decision of the immigration judge. There are two issues in this case, the credibility and the authentication of official records from China. Mr. Ling had submitted three official records from China, and of central importance there's three of them that are of critical importance. One is the certificate of family planning operation showing that his wife was sterilized. The other one was the assessment of 35,000 renminbi, the Chinese money, and the third one is the receipt for the payment of the fine. The documents were submitted in August of 2001, and about a year later, the government attorney took possession of the original documents for a forensic analysis. A year after that, during the hearing, a year after that, the immigration judge proceeded with the hearing without the expert analysis, holding simply that the documents, although would be admitted into evidence, would be afforded discount to probative value, would be afforded little probative value. And... What was the reason given for that? Well, that's actually the basis of our concern, Your Honor. There was really no reason. The law, of course, requires that a determination of adverse credibility assessment be based on specific cogent reasons. The judge had offered that he was concerned with reports from the State Department, and I can sympathize with that, but that's, of course, not a substitute for substantial evidence. He simply said that because there was he simply afforded little probative value. And did the government give any reason as to why it took the documents, was unable to test them in the time that they had? No, Your Honor. They actually had requested a continuance after the immigration judge had granted an extension of time for the lab to complete the analysis. And when the time came, the government filed a motion to continue the case because the analysis had not been completed. Finally, about a year later, the judge said, well, I'm going to be disciplined because I have, the Congress has mandated that I complete cases within 180 days or something of that nature. And so I'm going to go ahead. In effect, he trumps the right, the Fifth Amendment right of the respondent in favor because of the concern for disciplinary action. So when the documents that are central to the issue, in other words, the forced sterilization, are discounted in such a manner, I think, you know, there's a serious concern in terms of whether or not we have afforded. Okay. Not putting, not minimizing that concern, but let's move on to the actual story. Here's one question I would like to ask. As I look at the I.J.'s decision, it says limited probative value on authentic grounds. Were they being authenticated or offered by your client as authentic based on anything other than his own testimony? Well, he brought them as original documents, Your Honor. Were they certified in some fashion? They were original documents with the official original seals of the government of the Chinese government. And so he's met his burden of proof insofar as HCFR 287.6 is concerned. The government, of course, while the regulation is not mandatory, it's permissive, the government took it upon itself to ask for an authentication, which they did not, ultimately did not provide. Not on a day of the hearing, not ever. Insofar as the Court's other concerns, in other words, the credibility, the testimonial evidence of the Petitioner, he was concerned in a couple of areas. And in all of those areas, he found, although they were the answers, testimony was unresponsive or evasive, he did not offer any specific cogent reasons for that determination. So, for example, on one occasion, on August 28, 1998, the family planning workers went to the home of the Petitioner and his wife during her fifth month of pregnancy and wanted her to go in for an abortion. So instinctively, according to Mr. Lin's testimony, and there's nothing to refute that, he pushed one of the, there was four of them, and one of them was a male. He pushed the male enforcer, and the male enforcer fell to the ground and bled, and he fled. The judge found that testimony, line of testimony, very troubling. He said, because how come you did not mention that in your application? Well, actually, he did in two different places. In his application, the I-589 application, in his statement, he goes into quite a bit of detail about the incident. Could you tell me where, I've got the AR right here in front of me. It's on page 357 of the transcript. No, I think that's the sterilization certificate. He submitted as, he named it Affidavit of Truth, Affidavit of Truth on 346. In the middle of the document, Your Honor, and thank you for the question, Judge Fletcher, he says that, and on August 28th, four enforcers showed up at our room. They demanded that my wife go with them to abort the child and then be sterilized. I instinctively, instinctively rushed towards my wife to protect her. However, one of them fell. He unfortunately fell, hit his head, and was bleeding. And this document was provided to whom at what time? It was originally provided in 2001, along with his application for political asylum. And was presented to whom? The asylum officer. And, of course, it was forwarded to the immigration judge for hearing. Okay. Thank you. That's not the only time he mentioned it, Your Honor. He also mentioned it in his, about a year later and prior, about a year prior to the hearing, he submitted photographs of his wife's scars from the cesarean, the unauthorized, the forced sterilization, wherein, again, he mentions that. She also had a C-section of the first child, didn't she? That's correct, Your Honor. And on the second occasion, although there was a lot of confusion there, and I think the irresponsive and evasive answers really had to do with misunderstanding and communication problems, as you can probably see from the transcript. I'm not saying that the interpreter and the petitioner did not understand each other, but English was not the native language of the interpreter. In any event, on that occasion, the judge found it incredible. But he didn't allude to any specific cogent reasons for his determination, and not only that, it was an erroneous assessment of the record. And therefore, his assessment is not supported by substantial evidence, and the Court has got to look at that. It's a very serious concern because it's the crux of the application. And this Court has held over and over again that where a determination of adverse credibility is concerned, that assessment must be based on substantial evidence and not conjecture and speculation. I'm not sure how relevant this is, but the story that we're told, even assuming that the outlines of it are correct, the issue is not whether she had a forced abortion because, however this transpired, she had the second child, we know that. The issue is forced sterilization. And the story, as we get it, is that he and she preferred not to have a cesarean the second time around, would have preferred a natural vaginal birth, that she had a cesarean against her will, and while she was opened because of the cesarean, the sterilization took place. I find a little difficulty in the notion that a natural vaginal birth was going to be available. The second time around, because that's not the normal procedure. And that was his testimony. He testified regarding that, and that was the source of the confusion. In other words, cesarean was not necessary. However, they did it because they wanted to, at the same time, commit. No, but I'm going the other way. I'm saying that at least, and I have to say I'm not familiar with the specifics of Chinese medical practice, but if this were an American medical practice, it would be unusual, after having had one c-section, not to have the second birth be done by a second c-section, purely as a matter of medical precaution. Well, we have to take, Your Honor, the documents as what they are, unless, of course, there's problems that come back from the analysis. Because in the sterilization operation certificate, it stated that comrade Pei Wen Gu, Mrs. Lin, had cesarean section and sterilization procedures at this hospital. And what he said about that- I understand that, but what I'm interested in, not as whether or not there was a sterilization for the purpose of the current line of questioning, I'm quite willing to accept that the second birth was by cesarean, and that there was sterilization performed as part of that process after the birth. I'm more interested in figuring out the degree of coercion or involuntary. We know from his own testimony that they were not trying to have a second child. When she became pregnant with a second child, his testimony is, not surprisingly, they were delighted, which is a fairly common reaction, but that they weren't trying to do so because it was against policy. I'm trying to figure out how likely it is, or how strong their sense of resistance would have been to a sterilization at the second birth. Not the question of whether she was sterilized, but whether it was a forced sterilization. Right. Well, we can infer, Your Honor, that she definitely did not want the sterilization. They were afraid of it. In fact, the testimony showed that she's the person that sent the document, the photographs and other certificates over to the petitioner in preparation for his application for asylum. Okay, of course. Tells us she may want him to be here, but doesn't really tell us very much about. I've had the same question Judge Fletcher had. The idea is that they didn't really, they weren't planning to have a second child. They knew it was against the policy, pleasant surprise. But if they weren't planning to have a second child, it wouldn't surprise me that they really wouldn't anticipate having a third. And so what evidence is there of resistance to the ---- Well, the totality of the circumstances suggests that they resisted any intrusion into their bodies, at least not on a voluntary basis. So, for example, she was given the choice of either quitting, in other words being fired, or having an abortion. And it would have been a very simple matter if she had any, if there was any basis to think that she might have not resisted any involuntary intrusion into her body. So rather than choosing to abort the fetus, she let herself be fired. Of course. But whether to abort an about to be viable fetus is a very different question from whether after the birth by cesarean section of what is now a live child, whether to be sterilized at that time. Now, we've run you over your time, in fact by several minutes. Let's hear from the government and we'll give you a chance to respond. Thank you very much. Good morning. May it please the Court. Alan Birch for the government. The credibility finding is the core of this case. And as Judge Fletcher alluded to, the key question is whether the sterilization was voluntary or forcible. The key question, it seemed like also a big part of it was that the story about being with the brother and all that was unbelievable to the I.J., and also that there were these monthly visits during all that time. I thought I put more emphasis on his determination that that whole story was not believable. As I count it, Your Honor, the I.J. had numerous reasons for the adverse credibility finding. I find six of them to be particularly well supported in the record. Petitioner was inconsistent on, first of all, whether there was a need for the cesarean section the second time around. The timing of the employer's threats to the wife about losing her job, was it in April, was it in July? Was there an arrest warrant issued for him for assaulting the enforcer? His reasons for wanting to come to the United States shifted. Number five, he was able to apparently get a passport, even though the police were supposedly looking for him. And number six, the 48 supposed monthly visits to the wife's house, at least many of which occurred after he left the country. Each of these six would be enough to cast doubt on the petitioner's story. In combination, it's more than enough. Certainly the record doesn't compel a contrary finding. If I could back up for one minute with respect to the documentary authenticity, that wasn't really argued through the briefs. And with respect to the key document about sterilization, which does appear, I think, at 347 of the record. Hang on a second. I'll get the right side for you. 357. It appears that the judge accepted that without restriction into evidence. That's on page 45 of the record. He's listing the documents, and he says identification documents. A statement from the respondent regarding cesarean and sterilization, admitted. And he doesn't say admitted with restrictions, as he does for the other documents. But even so, the documents above are relating to the fine, and he talks about limited probative value. That limited probative value never shows up in his analysis. It's not clear that he relied on the limitations of the probative value in any way. Well, I guess the potential effect might be whether the documents would reinforce or reinstate the credibility of the applicant by saying the story I tell checks out, and these documents help prove it. Sure, Your Honor. At this point, I'm willing to concede the authenticity of the documents. I don't think that they materially changed the analysis at all. The fine was for violating the policy, not, as I understand it, for resisting or assaulting the male enforcer. So that is what it would need to be in order to support the story of this forcible sterilization by resulting after a fight and resistance throughout. How about the birth certificate of where the baby was born? That's not one of the six things I listed, Your Honor. I think the record is muddied on that. It's possible to uphold the IJ's finding, but the Respondent's explanation was also plausible. If you bring the standard review, is the contrary finding compelled? No, I don't believe so. But on the other hand, the IJ did seem to be relying a little bit too much on his own sense of the geography of the place. So I wouldn't put that among the six things that would support the credibility finding. He did. He did, but there were other numerous ones that would support his finding, otherwise. You wouldn't put it at the top of the list that you want us to pay attention to? No. What are the rules with regard to, I mean, it's not a mathematical test, but how many do we need to say, well, that checks out to be able to say that the IJ would have reached the same conclusion? As a mathematical matter, you need one that goes to the heart of his story. And I would submit that all six of these go to the heart of his story, because they all relate to whether the issue of this was forced was made up after the fact or not. There are no other questions. I would request that the petition be denied.  Thank you. Response. The six stories recounted by the immigration judge are not based on specific cogent reasons. In other words, the judge uses his personal experience in making the assessment. And so, for example, for the arrest warrant, petitioner never mentioned the arrest warrant at the initial stage of the hearing. He said he was concerned that because of what he'd done, and in his words, because of a guilty conscience, they're going to be after him. And from there it went to an arrest warrant. And furthermore, it became speculation and conjecture that the Chinese government would do whatever it is that the judge thinks that they might have done. In other words, he did not base this analysis on any specific reason. Was the testimony about the number of times that they came monthly to see him, to try to get him? Yes. The judge found that troubling, I know. But I thought, excuse me, the transcript shows that Mr. Lin had provided a detailed explanation. In other words, in his statement that he sent along with the photographs that his wife provided, he said that after the sterilization, the persecution began. In other words, he alluded to the fact that he was continually being harassed, if I may use that term, or being visited. The constant, unrelentless visits from the family planners. And there's nothing inherently unbelievable about that. In other words, it's just speculation and conjecture that the government would do whatever it is that, in other words, go over to his house and ask for his whereabouts. And the inconsistency that the judge found in the government looking for him at his grandmother's house and asking about the son is not even relevant because nobody asked him anything about the son. So he testified according to what he was asked, truthfully. And, Your Honor, he comes to us with a high school education. He did the best he could with what he understood was important to the case and what the judge was asking him about. Okay. Thank you very much. Thank both sides for their argument. The case of Lin v. Keisler now submitted for decision. The next case on the argument calendar is Berrigan-Lopez v. Keisler.
judges: Hug, W. Fletcher, Clifton